# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**JAMES VERN PENNEWELL,**
    **Plaintiff,**

v.                                                                                                                                                                       Case No. 17-C-213

**DR. JAMES PARISH, *et al.*,**
    **Defendants.**

## ORDER

Plaintiff James Pennewell, a Wisconsin state prisoner who is representing himself, filed a complaint under 42 U.S.C. § 1983 alleging that defendants violated his civil rights. Docket No. 1. I screened the complaint on March 20, 2017 and allowed plaintiff to proceed with an Eighth Amendment claim that defendants (including a party identified as "Unknown Eye Technicians") showed deliberate indifference towards his eye problems. Docket No. 4 at 4-5. I instructed plaintiff to identify "Unknown Eye Technicians," on or by August 25, 2017, and warned him that, if he did not, I would dismiss that party from the case. Docket No. 15. Plaintiff did not identify "Unknown Eye Technicians" by the deadline, and therefore I will dismiss his claims against it. Below, I consider the parties' pending motions.

### I. DEFENDANTS' MOTIONS TO STRIKE PLAINTIFF'S SUR-REPLIES

Defendants filed motions for summary judgment on October 24, 2017. Docket Nos. 27 and 37. They also filed motions to strike plaintiff's sur-replies to the motions for summary judgment. Docket Nos. 46 and 48. Defendants explain that they did not raise any new issues in their reply brief and that plaintiff never sought leave from the court to file a sur-reply. *Id*.

Plaintiff did not file an opposition to defendants motions to strike nor did he explain in his sur-reply why he needed to file a sur-reply to properly prosecute this case. *See* Docket Nos. 45 and 47. Therefore, I will grant defendants' motions to strike the sur-replies. *See* Civ. L. R. 7(i) ("Any paper, including any motion, memorandum, or brief, not authorized by the Federal Rules of Civil Procedure, these Local Rules, or a Court order must be filed as an attachment to a motion requesting leave to file it.").

## II. DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

### a. Facts[1]

At the time relevant to this matter, plaintiff was an inmate at the Dodge Correctional Institution ("DCI") who was transferred to the John Burke Correctional Center ("JBCC"). Docket No. 29, ¶¶ 6, 15. Defendants are Department of Corrections ("DOC") employees/contractors who work at DCI and JBCC: James Richter is an Optometrist who provides eye care at DCI; James Parish is a Physician's Assistant at DCI; Sandra Jackson and Victoria Bruns are Nurses at JBCC; and Brian Lange and Heather Bunker are Correctional Sergeants at JBCC. *Id.*, ¶¶ 4-5. Mark Rice, Scott Hofteizer, Denise Bonnett, Paula Lampe, Julie Nickel, Patricia Beyer, Jeffrey Rollins, and Nicholas Redeker are also defendants in this case but neither party provides

---

[1] I take facts from defendants' proposed findings of fact (Docket Nos. 29 and 40) and plaintiff's sworn complaint (Docket No. 1), which I construe as an affidavit at the summary judgment stage. *Ford v. Wilson,* 90 F.3d 245, 246-47 (7th Cir. 1996). Where plaintiff fails to dispute defendants' proposed findings of fact with relevant evidentiary material, I consider those facts admitted for purposes of summary judgment. *See* Civ. L. R. 56(b)(4).

specific information on who these individuals are or what institution they worked at. *See* Docket Nos. 29 and 42.

Plaintiff arrived at DCI on February 3, 2015. Docket No. 29, ¶ 6. Plaintiff talked to an eye technician during his "intake eye screening" and explained that he was blind in his left eye and had "shadows, ghosts, and the vision is decreasing" in his right eye. Docket No. 42 at 3. The eye technician said she would "fast track" plaintiff for a quicker eye exam. *Id.*

About a week later, on February 11, 2015, Richter examined plaintiff's eyes. Docket No. 40, ¶ 1. Plaintiff told Richter that he was blind in his left eye and the vision in his right eye was "decreasing, foggy, floaters, spots, ghosts, shadows, and flashes but not as bad as 2008 left detachment." Docket No. 42 at 3. The "Eyecare Examination Form" that Richter completed during the exam indicates that plaintiff reported blindness and no light perception in his left eye and "floaters + foggy" in his right eye. Docket No. 17-1 at 53; *see also* Docket No. 40, ¶ 2-3. Plaintiff also told Dr. Richter he could not see very well even though his glasses were only a few months old. Docket No. 42 at 3.

Richter performed a "dilated fundus evaluation" on plaintiff's eyes and concluded that plaintiff had the wrong prescription. Docket No. 40, ¶ 4. Richter ordered new glasses with a proper prescription. *Id.*, ¶ 5. Richter also referred plaintiff to the University of Wisconsin Eye Clinic ("UWEC") for evaluation and possible extraction of a right eye cataract. *Id.*, ¶ 6. Richter did not communicate with or examine plaintiff again until seven months later, on September 22, 2015. *Id.*, ¶¶ 35-36.

After Richter's evaluation, Parish performed an "intake physical exam" of plaintiff later that same day. Docket No. 29, ¶¶ 7-8. Parish reviewed Richter's notes on plaintiff's

eye problems and recorded the issues on plaintiff's "problem list." Docket No. 29, ¶¶ 9-11. Plaintiff told Parish that he had a "blind left eye and right eye decrease vision problems." Docket No. 42 at 3. Plaintiff had already been seen by an eye specialist earlier in the day; therefore, Parish did not order anything for plaintiff's eyes. Docket No. 29, ¶¶ 11-13. He did, however, order treatment for plaintiff's other medical issues. *Id.* Parish continued to provide plaintiff with medical care for his other medical issues while at DCI, but he never communicated with plaintiff regarding his eye problems after the intake screening on February 11, 2015. *Id.*, ¶ 14.

About one month later, on March 17, 2015, the DOC transferred plaintiff to JBCC. *Id.*, ¶ 15. Bruns performed a transfer screening similar to the intake screening Parish performed at DCI. *Id.*, ¶¶ 16-19. Plaintiff reported "blind left eye, right eye vision was decreasing with foggy, floaters, ghosts, and spots in vision." Docket No. 42 at 4. The "Progress Notes" that Burns completed that day shows that plaintiff reported left eye blindness and poor vision in his right eye with cataract. Docket No. 29, ¶ 18; Docket No. 31-1 at 20. Bruns noted that plaintiff had an appointment with UWEC scheduled for April 14, 2015. *Id.*, ¶ 20.

About a week later, on March 30, 2015, plaintiff submitted a Health Services Unit ("HSU") request. *Id.*, ¶ 24. The requested stated:

> I am scheduled for an eye appointment in Madison. My right eye is painful the Tylenol is not working for pain. It feels like there is a tear in my eye. I am very red it drains then dries up. I have to put warm water on a washcloth to get it open. When can it be looked at, soon I'm hoping.

Docket No. 42 at 4*; see* Docket No. 31-1 at 93. Jackson saw plaintiff's HSU request and scheduled him for an appointment that same day at 4:15 p.m. Docket No. 29, ¶ 26.

4

Plaintiff told Jackson that the symptoms in his right eye "was getting worse." Docket No. 42 at 4. Jackson states that plaintiff complained about pain but did not report floaters, shadows, or a loss of vision, nor did he state that he needed to be seen more quickly or that his eye condition was an emergency. Docket No. 29, ¶¶ 18, 32. Jackson told plaintiff to wash his hands regularly and not touch his eyes. Docket No. 29, ¶¶ 29, 34; *see also* Docket No. 31-1 at 20. According to Jackson, plaintiff's primary focus at the appointment was to find out when his appointment with UWEC was scheduled. Docket No. 29, ¶ 30. Jackson told plaintiff that he was scheduled for an appointment in April but she couldn't tell him the exact date. *Id.* ¶ 31; *see also* Docket No. 42 at 4. Plaintiff allegedly responded "OK, that's good. I am glad its scheduled." Docket No. 31-1 at 20.

About a week later, on April 6, 2015, plaintiff submitted another HSU request. Docket No. 29, ¶ 36. The request stated:

> "The pain in my left eye is getting bad and the vision in my right eye is deteriorating, it's as if there is a retinal detachment. The vision in my right eye has a shadow in the lower right limiting my vision, some flashes of light, Thank you."

Docket No. 42 at 4; *see* Docket No. 31-1 at 94. Bruns scheduled plaintiff for an appointment the next morning, on April 7, 2015. Docket No. 29, ¶ 37. Plaintiff states that he told Bruns "half [his] vision was gone" and "I had a right eye retinal detachment and I will lost all my vision if I did not get medical attention." Docket No. 42 at 4. Bruns contacted Denise Bonnett and Scott Hoftiezer regarding plaintiff's complaints; by 9:30 a.m. that morning, Bonnett and Hoftiezer approved plaintiff's transfer to the Waupun Memorial Hospital Emergency Room. Docket No. 29, ¶¶ 39-40. Bunker transported

plaintiff to the ER at 11:00 a.m. Docket No. 42 at 4. Bunker had no other interactions with plaintiff regarding his eyes. Docket No. 29, ¶¶ 69-85; *see also* Docket No. 42.

Once plaintiff arrived at Waupun Memorial Hospital, ER staff transported plaintiff to UW Hospital in Madison. Docket No. 29, ¶ 43. At UW Hospital, Dr. Michael Altaweel[2] examined plaintiff's eyes and diagnosed him with "uncomplicated retinal detachment." *Id.*, ¶ 44. He surgically repaired plaintiff's eye that same day. *Id.* Plaintiff returned to JBCC the next day, on April 8, 2015. Docket No. 42 at 4.

On June 29, 2015, plaintiff filed a HSU request stating

> "vision is starting to get worse. I can only read large print, foggy, double vision, halos around objects. I can only identify objects or people when within 3 feet."

Docket No. 42 at 5; *see also* Docket No. 31-1 at 96. Bruns called UW Hospital for advice on how to handle the issue; they told her that plaintiff should be seen at the clinic that same day. Docket No. 30, ¶ 24. JBCC staff took plaintiff to UW Hospital later that day and plaintiff was diagnosed with a "macular hole," which would have to be corrected with surgery. *Id.*, ¶¶ 20-22.

The next day, on June 30, 2015, plaintiff filed an HSU request asking for a second opinion on whether he needed surgery to fix the macular hole. Docket No. 42 at 5; *see also* Docket No. 31-1 at 29. He explained that he "wanted to be safe" because it was the only eye he could still see with. Docket No. 42 at 5. Jackson wrote back stating

---

[2] Dr. Altaweel is a Board Certified ophthalmologist who works at the University of Wisconsin Hospital and Clinics. Docket No. 30, ¶¶ 1-2 Dr. Altaweel's declaration is based on review of plaintiff's certified medical records from the DOC dated February 3, 2015 through July 5, 2017, which included "progress notes," eye exams, "prescriber's orders," and plaintiff's HSU requests. *Id.*, ¶ 8.

that the DOC does not do second opinions. *Id.* Dr. Altaweel performed surgery to fix plaintiff's macular hole in July 2015. Docket No. 40, ¶ 32. Plaintiff explains that for the next 8-10 weeks, he had to wear a "blind right eye shield" for the "gas bubble" in his eye to dissipate. Docket No. 42 at 5. He could not see with either eye during this time period.

On September 22, 2015, Richter performed his second and final examination of plaintiff. Docket No. 40, ¶¶ 36, 40. Richter did a vision test, corrected the prescription in plaintiff's right eye, ordered new lenses, and ordered a "sheet magnifier" to help plaintiff read. Docket No. 40, ¶ 40. Richter's progress notes state that plaintiff was "happy with vision." Docket No. 17-1 at 58. Richter recommended a follow-up appointment in six weeks and noted that plaintiff should be scheduled for an appointment with UWEC if his vision did not improve. Docket No. 40, ¶¶ 41-42. Plaintiff notes that he was never actually scheduled for a follow-up appointment and when he received his new glasses it was the wrong prescription so he had to send them back for the correct prescription. Docket No. 42 at 5. Richter did not have any further interactions or communications with plaintiff after this date. Docket No. 40, ¶ 36.

On October 14, 2015, plaintiff filed an HSU request stating that his right eye was painful and causing headaches. Docket No. 42 at 5. Bruns called UW Hospital to determine how to treat plaintiff and was told to bring plaintiff into the clinic at 3:00 p.m. that day. Docket No. 30, ¶ 28. Julie Nickel took plaintiff to UW Hospital later that day. Docket No. 42 at 5.

About a year later, in November 2016, plaintiff's follow-up appointment at UWEC was cancelled because there was no staff for transportation. *Id.* at 6. Plaintiff states he

suffered pain and could not see for a month because "staff wanted a 4 day Thanksgiving weekend." *Id.* at 7.

On December 7, 2016, plaintiff had "punctual plug" surgery to help relieve symptoms of dry eye. Docket No. 40, ¶ 45. At that time, plaintiff's visual acuity was 20/500. Docket No. 42 at 6.

Six months after that, in June 2017, Dr. Altaweel tested plaintiff's visual acuity again and it was 20/2000, which meets the criteria for legal blindness. Docket No. 40, ¶¶ 46-47.

  b. Discussion

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgement as a matter of law." Fed. R. Civ. P. 56(c); *Ames v. Home Depot U.S.A., Inc.*, 629 F.3d 665, 668 (7th Cir. 2011). The movant bears the burden of establishing that there are no genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The court grants summary judgment when no reasonable jury could find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

   1. Section 1983's Personal Involvement Requirement

Section 1983 imposes liability based on a defendant's personal involvement in the constitutional deprivation. *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995). "An official satisfies the personal responsibility requirement of section 1983…if the conduct causing the constitutional deprivation occurs at [his] direction or with [his] knowledge and consent." *Id.* (quoting *Crowder v. Lash*, 687 F.2d 996, 1005 (7th Cir. 1982)). He

"must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye." *Id.* (quoting *Jones v. City of Chicago*, 856 F.2d 985, 992 (7th Cir. 1988)).

Defendants assert that Mark Rice, Scott Hofteizer, Denise Bonnett, Paula Lampe, Julie Nickel, Patricia Beyer, Jeffrey Rollins, and Nicholas Redeker are entitled to summary judgment based on lack of personal involvement. According to defendants, they sent plaintiff interrogatories asking him to: (1) identify every individual he talked to or wrote to about the events alleged in the complaint, and (2) describe the content of the conversation/correspondence. Docket No. 36-1 at 4-5. Plaintiff identified Parish, Richter, Jackson, Bruns, Lange, and Bunker as individuals he notified about his condition. Docket No. 36-1 at 7-9. He did not identify Rice, Hofteizer, Bonnett, Lampe, Nickel, Beyer, Rollins, and Redeker. *See id.* Based on plaintiff's interrogatory response, defendants ask for dismissal of Rice, Hofteizer, Bonnett, Lampe, Nickel, Beyer, Rollins, and Redeker from the action for lack of personal involvement.

In response, plaintiff explains that "defendants named in this case violated my constitutional, 8th Amendment rights" but he "cannot remember every name and detail of every encounter." Docket No. 42 at 9. Plaintiff does not mention Lange, Beyer, or Rollins anywhere in his briefing materials. Docket No. 42. Therefore, he cannot establish that Lang, Beyer, or Rollins were personally involved in the alleged constitutional violation.

Plaintiff asserts that Rice denied him "compassionate release" in June 2016. Docket No. 42 at 5. He explains that "this was not Rice's decision to make; he violated state statutes and DAI Policy. *Id.* Plaintiff does not have a constitutional right to compassionate release. *See Puerner v. Smith*, No. 09-C-1051, 2009 WL 4667996, at *2

(E.D. Wis. Dec. 3, 2009). ("The continued incarceration of an ill inmate does not violate the Eighth Amendment."). Further, compassionate release is a matter of state law which must be pursued in state court. *Id.* Thus, plaintiff cannot proceed past summary judgment with a claim against Rice.

Next, plaintiff states that Hofteizer and Bonnett were involved in approving his transfer to UW Hospital on April 7, 2015; Bunker and Nickle were the individuals who drove him to UW Hospital. *See* Docket No. 42 at 4-5. Based on plaintiff's allegations, it's unclear how Hofteizer, Bonnett, Bunker, and Nickle "knowingly approved, condoned, or turned a blind eye" towards his eye problems. Plaintiff's allegations show that all four attempted to get plaintiff the treatment he needed. Therefore, plaintiff cannot proceed past summary judgment with claims against Hofteizer, Bonnett, Bunker, and Nickle.

Plaintiff states that Lampe "walked [him] directly into a brick wall while escorting [him] to health services." Docket No. 42 at 5. Plaintiff says "I know it was not intentional but this is an instance the DOC staff does not realize my difficult circumstances and seriousness of my blindness. *Id.* Lampe's conduct was (at most) negligent, and negligence does not violate the Eighth Amendment. *See Snipes v. DeTella*, 95 F.3d 586, 590 (7th Cir. 1996)("Mere negligence or even gross negligence does not constitute deliberate indifference."). Therefore, plaintiff cannot proceed past summary judgment with claims against Lampe.

Finally, plaintiff states that Redeker "knew of my vision problems" and was "only interested in being a part of the punishment." Plaintiff provides no details on how Redeker knew about his vision problems or what Redeker specifically did or did not do

to violate his constitutional rights. Therefore, plaintiff cannot proceed past summary judgment with claims against Redeker.

Based on plaintiff's allegations, no reasonable jury could conclude that Rice, Hofteizer, Bonnett, Bunker, Nickle, Lampe, Redeker, Lang, Beyer, or Rollins knowingly approved, condoned, or turned a blind eye to plaintiff's medical conditions. Therefore, I will grant their motion for summary judgment.

  2. Eighth Amendment Deliberate Indifference

"Prison officials violate the Eighth Amendment. . . when their conduct demonstrates 'deliberate indifference to serious medical needs of prisoners.'" *Gutierrez v. Peters*, 111 F.3d 1364, 1369 (7th Cir. 1997). Deliberate indifference contains both an objective element and a subjective element *Id.*

Under the objective element, the plaintiff must show that his medical condition was sufficiently serious. *Id.* at 1373. A medical condition is sufficiently serious if it has been diagnosed by a physician as mandating treatment or is so obvious that even a lay person would easily recognize the necessity for a doctor's attention. *Id.* "A medical condition need not be life-threatening to be serious; rather, it could be a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated." *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011)(quoting *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010)).

Under the subjective element, the plaintiff must show that the officials acted with a sufficiently culpable state of mind. *See Farmer v. Brennan*, 511 U.S. 825, 847 (1994). A prison official must have actual knowledge of the inmate's serious medical condition and either act or fail to act in disregard of that risk. *Roe*, 631 F.3d at 857. Deliberate

indifference "is more than negligence and approaches intentional wrongdoing." *Collignon v. Milwaukee Cnty.*, 163 F.3d 982, 988 (7th Cir. 1998).

Mere disagreement with a medical professional's medical judgment is insufficient to prevail on a claim. *See Estelle v. Gamble*, 429 U.S. 97, 106; *see also Arnett v. Webster*, 658 F.3d 742, 751 (7th Cir. 2011). A plaintiff must show that a "professional's subjective response was so inadequate that it demonstrated an absence of professional judgment, that is, 'no minimally competent professional would have so responded under those circumstances.'" *Arnett,* 658 F.3d at 751 (quoting *Roe*, 631 F.3d at 857).

Plaintiff makes two main arguments: (1) that Richter, Parish, and Jackson's failure to diagnose his right eye retinal detachment in February and March 2015 caused him to go completely blind in June 2017, and (2) that Richter, Parish, Bruns, and Jackson generally ignored his eye problems while he was incarcerated. *See* Docket No. 42.

Regarding plaintiff's first argument, plaintiff has no proof showing that he had a retinal detachment when he interacted with Richter, Parish, and Jackson in February and March 2015. Dr. Altaweel diagnosed plaintiff with retinal detachment on April 7, 2015 but Dr. Altaweel did not draw any conclusions on how long the plaintiff had the condition. It's entirely possible that plaintiff first suffered the condition when he complained about it to Bruns the day before, on April 6, 2015.

In any event, even if plaintiff had a retinal detachment prior to April 7, 2015, misdiagnosis of a medical condition, alone, does not show "deliberate indifference." *See Williams v. Guzman*, 346 F. App' 102, 106 (7th Cir. 2009). Instead, plaintiff must show that "no minimally competent" medical professional would have acted as defendants

12

did. According to Dr. Altaweel, absent "loss of vision" and "flashes of light" there is no need for emergency medical care. The record shows that plaintiff complained about "foggy, floaters, spots, ghosts, shadows, and flashes" numerous times in February and March 2015, but the first time he complained about loss of vision was on April 7, 2015, when he told Bruns he could not see in the bottom portion of his eye. At that point, Bruns immediately requested approval to transfer plaintiff to UW Hospital, and two hours later, plaintiff was treated at the UW Hospital.

Moreover, plaintiff has no evidence showing that his retinal detachment from April 2015 (or any other eye condition he has had since then) caused his blindness in June 2017. To the contrary, Dr. Altaweel specifically concluded that plaintiff's blindness was not caused by any of plaintiff's prior medical conditions or anything the defendants did or did not do. Docket No. 30, ¶¶ 33-34. Dr. Altaweel reviewed plaintiff's medical requests, medical record, and the prescriber's orders and concluded that defendants carried out all medical orders and follow-up treatment exactly as UWEC recommended. Docket No. 30, ¶¶ 8, 35.

Regarding plaintiff's second argument, that defendants generally ignored his eye problems while he was incarcerated, the record shows otherwise. Richter sufficiently treated plaintiff's eye problems. Plaintiff complained about decreased vision and Richter corrected plaintiff's prescription both times he examined plaintiff; he referred plaintiff to UWEC for evaluation (and possible extraction) of a right eye cataract; he also recommended several follow up appointments with UWEC if plaintiff's vision did not improve. Parish interacted with plaintiff once, after Richter had already examined plaintiff earlier in the day, and he relied on Richter's expertise in eye care. Nothing in the

record shows that either Richter or Parish were deliberately indifferent towards plaintiff's eye care needs. *See Lewis v. Gray*, No. 2:10-CV-200-JMS-WGH, 2012 WL 899255, at *4 (S.D. Ind. Mar. 15, 2012) (concluding that defendants were not deliberately indifferent towards plaintiff's eye care needs when the record showed that the DOC doctor submitted numerous requests and consultations for plaintiff to be examined by eye specialists.)

Similarly, the record shows that Jackson and Bruns responded to and/or scheduled plaintiff for an appointment in response to each HSU request he filed. Jackson scheduled plaintiff for an appointment on March 30, 2015 when he complained about redness and eye pain. She gave him treatment consistent with pinkeye. Dr. Altaweel reviewed plaintiff's HSU request and medical records and concluded that Jackson's decision to give plaintiff treatment consistent with pinkeye did not fall below the standard of care. Docket No. 30, ¶ 9. Jackson did deny plaintiff's request for a second opinion on his macular hole surgery, but plaintiff does not have a constitutional right to the treatment of his choosing or to have second opinions on his medical needs. *See Snipes v. DeTella*, 95 F.3d 586, 591 (7th Cir. 1996); *see also Lacy v. Cole*, No. 11-CV-1084, 2012 WL 441284, at *2 (E.D. Wis. Feb. 10, 2012)(concluding that plaintiff's desire for a "second opinion" did not state a valid Eighth Amendment claim).

Similarly, Bruns scheduled plaintiff for appointments when he requested and called UW Hospital on at least two occasions to determine how to handle plaintiff's eye care needs. Bruns also requested an immediate transfer to UW hospital when plaintiff complained about loss of vision. Nothing in the record shows that either Jackson or Bruns were deliberately indifferent towards plaintiff's eye care needs. *See Famous v.*

*Zohia*, No. 13-CV-195, 2015 WL 4949601, at *5 (E.D. Wis. Aug. 18, 2015)(concluding that defendants were not deliberately indifferent towards plaintiff's eye care needs because "plaintiff has never been denied any requested appointments, follow-up care, or referrals…[and] has been seen by multiple eye care specialists.")

Based on plaintiff's statements and allegations, no reasonable jury could conclude that Richter, Parish, Jackson, or Bruns were deliberately indifferent towards plaintiff's eye problems. Therefore, I will grant defendants' motions for summary judgment and will dismiss this case.

### III. CONCLUSION

For the reasons discussed above, **IT IS ORDERED** that Unknown Eye Technicians is **DISMISSED** from the action.

**IT IS FURTHER ORDERED** that defendants' motions to strike plaintiff's sur-replies (Docket Nos. 46 and 48) are **GRANTED**.

**IT IS FURTHER ORDERED** that defendants' motions for summary judgment (Docket Nos. 27 and 37) are **GRANTED** and this case is **DISMISSED.** The Clerk of Court enter judgment accordingly.

This order and the judgment to follow are final. A dissatisfied party may appeal this decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within **30 days** of the entry of judgment. *See* Fed. R. App. P. 3, 4. I may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. *See* Fed. R. App. P. 4(a)(5)(A).

Under certain circumstances, a party may ask me to alter or amend my judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **28 days** of the entry of judgment. I cannot extend this deadline. *See* Fed. R. Civ. P. 6(b)(2). Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. I cannot extend this deadline. *See* Fed. R. Civ. P. 6(b)(2).

I expect parties to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

Dated at Milwaukee, Wisconsin, this 20th day of July, 2018.

s/Lynn Adelman
LYNN ADELMAN
District Judge